IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **SCOTTY FIKE,** | ] |
| Plaintiff, | ] |
| v. | ] |
| | ] Case No.: 14-cv-00019-KOB |
| **NICHOLS ALUMINUM - ALABAMA, LLC,** | ] |
| Defendant. | ] |

**MEMORANDUM OPINION**

In June of 2012, Defendant Nichols Aluminum created three new Team Leader positions in its mill production line and began accepting applications. All applicants for the position interviewed before a four-member panel that scored the applicants on a scale of one to ten in four categories—qualifications, attendance, leadership skills, and performance history. Plaintiff Scotty Fike, who was born missing his left forearm, applied for the Team Leader position. Mr. Fike interviewed well, receiving the fourth-highest score. However, because he did not receive one of the top three scores, Mr. Fike was not offered a position as a Team Leader.

Mr. Fike believes that he was more qualified than the third-highest scoring employee, Vonda Darlene Hughes, and contends that the only reason he did not receive the promotion is because of his disability. Accordingly, he brought the current suit against Nichols for discriminating against him on the basis of his disability in violation of the American with Disabilities Act ("ADA"). (Doc. 1). This matter is now before the court on Nichols' motion for summary judgment. (Doc. 14). For the reasons discussed below, this court will GRANT

1

Nichols' motion.

## I.  STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). Once the moving party meets this burden, the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find in its favor. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). In doing so, all evidence and reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). However, conclusory allegations based on subjective beliefs are

insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment.  *See Holified v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam).  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## II.  STATEMENT OF FACTS

Mr. Fike began working at Nichols' aluminum and sheet metal manufacturing plant in 2002.  Nichols originally hired Mr. Fike to work in the scrap department but promoted him to work as a leveler in the mill department within six months.  The leveler position involves operating numerous machines within the mill department and is not managerial in nature.  Mr. Fike remained in the leveler position for the next nine-and-a-half years, learning to operate all of the equipment within the mill department and frequently training other employees on the machines.  During this time, Mr. Fike earned numerous pay raises and gained the respect of his fellow employees, developing a reputation as a hard worker.  Mr. Fike also completed numerous workplace productivity classes.

Mr. Fike's time in the mill department, however, was not entirely without incident.  On numerous occasions, supervisors issued write-ups to Mr. Fike for mishaps within the mill department, some of which Mr. Fike took responsibility for and others of which he did not.  Additionally, on one occasion Mr. Fike refused to cooperate in an investigation regarding a safety violation that occurred within the mill department.  Matthew Crowson, the Training and Employee Relations Administrator, conducted the safety investigation and asked Mr. Fike some questions relating to the violation.  Although he was an eye witness to the violation, Mr. Fike

refused to tell Mr. Crowson what he had witnessed, choosing instead to protect his fellow workers.

In July of 2011, Nichols hired Ms. Hughes as a fork truck slitter within the mill department.  At the time she joined Nichols, Ms. Hughes had a proven record of leadership.  She had worked as a team lead at Nucor Steel, a competing metal manufacturing plant, and managed a local restaurant.  Additionally, Ms. Hughes had completed numerous leadership courses as well as courses in first aid, OSHA compliance, mobile equipment, and computer technology.

In June of 2012, Nichols created three new Team Leader positions in the mill department. Nichols posted notices of the new position and accepted job bids from interested employees.  The job posting provided the following description of the positions:

> **Skills required:**
> - Must be able to demonstrate leadership skills.
> - Must be able to demonstrate strong verbal communications skills.
> - Must be able to prove basic computer skills.
> - Be able to work collaboratively with other departments.
> - Qualified as a TWI Training Operator.
> - Must have good trouble shooting skills relative to the department or production area.
> - Be knowledgeable of and be qualified to perform the jobs with in (sic) the department or production area.
> - Have knowledge of all phases on Mill operations.

(Doc. 18-8, at 8).  Mr. Fike and Ms. Hughes both submitted bids for the Team Leader position and were given interview dates in July of 2012.

Both interviews were conducted before four panelists.  Fike's panelists were Beverly Thompson, Melanie Stephenson, Marty Reeves, and Matthew Crowson.  Ms. Hughes' panel was the same with the exception of Scott Wallace substituting for Mr. Reeves.  All interviews for the Team Leader positions followed the same structure.  First, the panelists explained to the

applicants that they would be assessed in four categories: qualifications, attendance, leadership skills, and work performance. Next, the panelists discussed with the applicant his or her personnel records as well as any other documents relevant to one of the four categories. Finally, Ms. Thompson asked each applicant thirteen standard questions. At the end of each interview, the panelists discussed as a group the applicant's suitability for the Team Leader position before individually assigning the applicant a score ranging from one to ten in each of the four categories.

After all the interviews were completed, the panelists compiled each applicant's points, converted the points to percentages, and entered the scores into a spreadsheet. Gary Smith and Ray Allen earned the two highest scores, scoring 75% and 71.25%, respectively. Ms. Hughes earned the third highest score, scoring 67.50%, followed by Mr. Fike with a score of 66.25%. After the scores had been compiled, the panelists, along with Nichols' production supervisors and lead engineer, reviewed the scores and discussed whether the scores accurately identified the top three candidates for the position. The group ultimately concluded not to deviate from the order reflected in the scores and offered the positions to the top three candidates—Mr. Smith, Mr. Allen, and Ms. Hughes.

In deciding to score Ms. Hughes higher than Mr. Fike, the panelists mainly focused on the initiative and leadership that Ms. Hughes showed in her background and in the interview. Ms. Thompson testified that she was impressed that Ms. Hughes had shown initiative and begun pursuing her Training Within Industry ("TWI") Trainer Certification before she was interviewed for the position. Mr. Crowson mentioned that he too was impressed that Ms. Hughes had shown initiative in pursuing leadership opportunities both in her previous employment and her work at

5

Nichols. Ms. Stephenson also cited Ms. Hughes' impressive work history and stated that Ms. Hughes gave an outstanding interview, displaying both competence and confidence.

In contrast, the panelists were concerned that Mr. Fike lacked the leadership skills necessary to be a Team Leader. Ms. Stephenson, who had known Mr. Fike for a while, was concerned that he would have a difficult time confronting other employees if he was offered a Team Leader position. Ms. Thompson noted that Mr. Fike described his leadership abilities as "middle of the road" and failed to identify any ways that he could contribute to the team. (Doc. 15-5, at 5). Mr. Reeves, who also had known Mr. Fike previously, noted that Mr. Fike was quiet in the interview and stated that if he had not already known Mr. Fike, he might have interpreted the quietness as indicating poor leadership or disinterest. Mr. Crowson stated that Mr. Fike failed to exhibit a passion for leadership during his interview. Mr. Crowson also testified that he remembered that Mr. Fike had refused to participate in the mill department safety investigation and was concerned that Mr. Fike would struggle enforcing shop rules for fear of offending his friends. Additionally, all of the panelists noted that Mr. Fike appeared nervous during the interview.

Following the selection, Human Resource Manager Beverly Thompson met with each of the employees who were not assigned a Team Leader position to offer individualized feedback. When Ms. Thompson met with Mr. Fike, he told her that he believed he was denied the position because of his disability. Mr. Fike subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC") on October 28, 2012. The EEOC issued Mr. Fike a right-to-sue letter on August 6, 2013. Mr. Fike initiated the current suit against Nichols on November 4, 2013.

### III.  DISCUSSION

Mr. Fike brings suit under the ADA, contending that Nichols discriminated against him in promoting Ms. Hughes to a Team Leader position instead of himself.  In cases such as this where direct evidence of discrimination is lacking, courts analyze ADA discrimination claims under the McDonnell Douglas framework.  *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).  Under this framework, an employee must first establish a prima facie case of discrimination.  *See id*.  To do so, the employee must show that he: "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability."  *See Hilburn v. Murata Electronics N. Am., Inc.*, 181 F.3d 1220, 1226–27 (11th Cir. 1999).  Once the employee establishes his prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action.  *See Cleveland*, 369 F.3d at 1193.  If the employer meets this burden, the burden returns to the employee to show that the employer's proffered reason is pretextual.  *See id.*

In the present case, the parties dispute whether Mr. Fike established his prima facie case of discrimination.  Nevertheless, even if Mr. Fike established his prima facie case, Nichols is nonetheless entitled to summary judgment because it proffers a legitimate non-discriminatory reason for its actions, which Mr. Fike fails to rebut.  Assuming Mr. Fike established his prima facie case, the burden then shifts to Nichols to proffer a legitimate non-discriminatory reason for denying Mr. Fike the promotion.  Nichols meets this burden by explaining that it promoted Ms. Hughes over Mr. Fike based upon Mr. Hughes' superior score on the scoring matrix.  As Nichols articulates a legitimate non-discriminatory reason for denying Mr. Fike the promotion, the burden shifts to Mr. Fike to prove pretext.

Mr. Fike first attempts to show pretext by arguing that the scoring matrix used by Nichols in selecting candidates does not provide a non-discriminatory reason for promoting Ms. Hughes over himself because the matrix was not "objective." Mr. Fike's argument is misplaced, however, because the ADA does not prohibit an employer from relying on subjective reasons in making personnel decisions. Rather, "[a] subjective reason is a legally sufficient, legitimate, non-discriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *See Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001). In this case, the panelists justified their scoring of Mr. Fike by pointing to his nervous demeanor, his responses to questions during the interview, and his prior performance in the mill department. These reasons provide a sufficient specific factual basis for their scores.

Mr. Fike next contends that the matrix score is not a legitimate non-discriminatory reason for denying him the promotion because a panel member, Mr. Crowson, impermissibly considered information gathered from outside the promotion process when scoring him, thereby treating Mr. Fike differently than the other applicants. Specifically, Mr. Fike points out that Mr. Crowson remembered that Mr. Fike had refused to cooperate in the mill departments' safety investigation. Mr. Fike argues that Mr. Crowson should not have considered his refusal to assist in the investigation when assessing him, but rather should have scored him solely based on his interview performance. Interestingly, Mr. Fike does not make the same complaint when another panelist, Mr. Reeves, gave Mr. Fike a higher score based on his prior knowledge of Mr. Fike's work history. However, regardless of whether the panelists' consideration of external information helped or hindered Mr. Fike's prospects, he fails to point to any policy prohibiting the panelists from considering their prior knowledge of each applicant. Indeed, this court

8

struggles to imagine how such a directive could possibly be helpful in selecting the best candidate for a position.  Because Mr. Fike fails to establish that he was treated differently in the interview process, he fails to show pretext on this basis.

Mr. Fike also attempts to show pretext by arguing that he was more qualified for the position than Ms. Hughes.  In the context of a promotion, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted."  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (internal quotations omitted).  Instead, "a plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that *no reasonable person*, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  *Id.* (emphasis added).  Mr. Fike fails to meet this heavy burden.

Mr. Fike argues that he was "plainly more objectively qualified" than Ms. Hughes because Ms. Hughes lacked the skills required to perform the job.  Specifically, Mr. Fike points out that among the traits listed under the "Skills required" section in the Team-Leader-job-opening form is the requirement that the applicant "[b]e knowledgeable of and be qualified to perform the jobs with in (sic) the department or production area."  (Doc. 18-8, at 8).  Ms. Hughes did not meet this requirement as she could not operate all of the machines within the mill department.  However, Mr. Fike's own testimony establishes that Ms. Hughes was not an anomaly in this regard and that other employees working as Team Leaders in the mill department also could not operate all of the mill department machines.  (Doc. 15-3, at 23).

9

Additionally, in arguing that Nichols should have strictly adhered to its list of required skills, Mr. Fike overlooks the fact that he too lacked some of the skills required for the Team Leader position.  In addition to indicating that a Team Leader should be capable of operating the machines within the mill department, the "Skills required" section specifies that the applicant should be "[q]ualified as a TWI Training Operator."  (Doc. 18-8, at 8).  At the time of the interview, neither Ms. Hughes nor Mr. Fike had completed TWI training, although Ms. Hughes had begun the process.  If Nichols would have strictly adhered to its list of "[s]kills required," as Mr. Fike contends it should have done, then he too would have been excluded from consideration.  Because both Ms. Hughes and Mr. Fike lacked some of the skills required to be a Team Leader, this court concludes that Mr. Fike has not demonstrated that he was objectively more qualified to the extent than no reasonable person could have chosen to promote Ms. Hughes instead of him.

Mr. Fike also attempts to demonstrate pretext by challenging the validity of the low scores he received in the leadership category.  Mr. Fike cites affidavits from many of his co-workers, attesting to his strong work ethic and leadership within the mill department.[1]  However, the fact that Mr. Fike's coworkers believed him to be a strong leader does not require that the panelists' assessments of his leadership abilities be equally glowing.  The panelists pointed to specific reasons supporting their determination that Mr. Fike's leadership skills were not on par with Ms. Hughes'—Mr. Fike appeared to be nervous in the interview and gave short answers, he failed to cooperate in the safety investigation, and he described his leadership skills as "middle of

---

[1] Nichols filed a motion to strike these affidavits for various reasons.  (Doc. 24).  However, because Nichols is entitled to summary judgment even if the affidavits are considered, this court deems Nichols' motion to be moot.

the road." These instances provide a sufficient basis on which the panelists could have concluded that Ms. Hughes would be a better Team Leader than Mr. Fike.

Finally, Mr. Fike argues that he can show pretext because a panelist, Mr. Reeves, assigned him an unreasonably low score in the qualification category—a three out of ten. Mr. Fike contends that he should have received a higher score because he was able to operate all of the machines within the mill department. However, the qualifications required for the Team Leader position involved more than simply the ability to operate the machines within the mill department. Among the other qualifications listed under the "Skills required" section of the job posting are the following characteristics: strong verbal communication skills, computer skills, leadership skills, the ability to collaborate with other departments, and the ability to trouble shoot issues within the department. Because the ability to operate the machines within the mill department was only one of many necessary qualifications for the Team Leader position, Mr. Reeves could have reasonably assessed Mr. Fike's skills as meriting only a three out of ten. As such, Mr. Fike fails to establish that Nichols' reliance on the scoring matrix as grounds for denying Mr. Fike a promotion was pretext for discrimination.

Because Mr. Fike fails to demonstrate pretext, Nichols is entitled to summary judgment on his discrimination claim.

## IV. CONCLUSION

For the reasons discussed above, the court will GRANT Nichols' motion for summary judgment as to Mr. Fike's ADA discrimination claim. Additionally, because Nichols' motion to strike Mr. Fike's affidavits does not alter the outcome of Nichols' summary judgment motion, this court deems the motion to strike to be MOOT.

The court will simultaneously enter a separate Order to this effect.

DONE and ORDERED this 5th day of March, 2015.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE